1
2
3
4
5
6
7
8
9
10
11
12
13

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
                                   )
LISA KEARNEY,                      )
                                   )        No. C14-1011RSL
                      Plaintiff,   )
                                   )        ORDER GRANTING DEFENDANT'S
        v.                         )        MOTION FOR SUMMARY
                                   )        JUDGMENT
THE BOEING COMPANY,                )
                                   )
                      Defendant.   )
_____)

14      This matter comes before the Court on "Defendant The Boeing Company's Motion for

15  Summary Judgment." Dkt. # 21. Plaintiff alleges that defendant discriminated and retaliated

16  against her in violation of the Washington Law Against Discrimination ("WLAD"). Boeing

17  seeks dismissal of all of plaintiff's claims.

18      Summary judgment is appropriate when, viewing the facts in the light most favorable to

19  the nonmoving party, there is no genuine issue of material fact that would preclude the entry of

20  judgment as a matter of law. The party seeking summary dismissal of the case "bears the initial

21  responsibility of informing the district court of the basis for its motion" (Celotex Corp. v.

22  Catrett, 477 U.S. 317, 323 (1986)) and "citing to particular parts of materials in the record" that

23  show the absence of a genuine issue of material fact (Fed. R. Civ. P. 56(c)). Once the moving

24  party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to

25  designate "specific facts showing that there is a genuine issue for trial." Celotex Corp., 477 U.S.

26

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

at 324. The Court will "view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor." <u>Krechman v. County of Riverside</u>, 723 F.3d 1104, 1109 (9th Cir. 2013). Although the Court must reserve for the jury genuine issues regarding credibility, the weight of the evidence, and legitimate inferences, the "mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient" to avoid judgment. <u>City of Pomona v. SQM N. Am. Corp.</u>, 750 F.3d 1036, 1049 (9th Cir. 2014); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986). Summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor. <u>FreecycleSunnyvale v. Freecycle Network</u>, 626 F.3d 509, 514 (9th Cir. 2010).

Having reviewed the memoranda, declarations, and exhibits submitted by the parties[1] and having heard the arguments of counsel, the Court finds as follows:

### BACKGROUND

Plaintiff began working at Boeing as a Test & Evaluation Engineering Level K Manager in June 2008. Plaintiff received satisfactory performance reviews and, in June 2010, was promoted to a Level L management position in Boeing's Defense Security and Global Transport and Executive Systems division. Her team of fifty was responsible for the Integrated Fleet Support ("IFS") contract between Boeing and the United States Air Force for the supply and provision of parts for Air Force Two. Robert Lacalli was on the four-person panel that

---

[1] The Declaration of David Wuerch (Dkt. # 29) has been considered only for the purpose of identifying Exhibit PP (Dkt. # 29-1).

The Court has considered the EEO and HR Investigation Statements in the record only to the extent that they are based on the interviewee's personal knowledge of the events described. For example, Jeri Haggard's statement that Robert Lacalli never acknowledged her until 2011 and her personal observations regarding the interactions between Lacalli and plaintiff during program management meetings have been considered, but her recounting of events or statements that she only heard about from plaintiff or third parties have not.

unanimously chose plaintiff for the position. He became plaintiff's immediate supervisor. The relationship was rocky from the start and lasted only eight months. Plaintiff was fired on March 23, 2011. Plaintiff argues that Lacalli disliked working with women, treated her differently from male managers, undermined her ability to manage her employees, gave her impossible assignments so that she would fail and he would have an excuse to fire her, and retaliated against her when she complained. Defendant argues that plaintiff failed to complete assignments in a timely manner and/or to expectations, that Lacalli had to do her work for her or assign tasks directly to her team members on a number of occasions, that plaintiff responded badly to criticism and remedial efforts, and that she shared information regarding management disputes with her team despite explicit directions to the contrary. In their memorandum, the parties adjust the chronology of events to support their respective stories. When the events are considered in the correct order, it is clear that plaintiff has failed to raise a genuine issue of fact regarding either her discrimination or retaliation claims.

Early in her tenure as a Level L manager, plaintiff was tasked with revising a report Boeing provided to the Air Force regarding airplane parts that were at risk of becoming obsolete (the "DMS" report). The Air Force wanted additional information in the report, including when a replacement design would be available. Lacalli warned plaintiff that the employee on her team who had developed the existing reporting mechanism had been resistant to any changes. Due dates on this project came and went, but plaintiff kept turning in a report that lacked the replacement design component requested by the Air Force. When pushed, she provided a statement from her employee explaining why Boeing should not make the change. After several months of not receiving an acceptable report, Lacalli assigned the project to a member of plaintiff's team, Suneet Thapar. Plaintiff does not dispute that she was unable to deliver an acceptable product or that Thapar was able to do so within a few weeks.

In early August 2010, Lacalli asked plaintiff to analyze the statement of work for a

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT          -3-

contract between Boeing and the Air Force to determine the necessary tasks, their relative priority, and how many employees Boeing needed to add to the team to ensure that the work would get done on time. Plaintiff was informed that she should base her assessment on the tasks required by the statement of work rather than on existing staffing and budgetary levels. Six weeks later, plaintiff produced an analysis based almost entirely on how much money was left in the budget and how many additional people could be hired with that amount. Lacalli confirmed with his supervisor, Kristy Kniest, that additional information was needed and explained to plaintiff that he wanted a bottom up analysis based on the demands of the statement of work, not a top down analysis based on how many dollars remained in the budget. Plaintiff's next two efforts were deficient: plaintiff's determination that 35-36 additional employees would be needed was not supported by anything other than the size of the excess budget. She did not identify the tasks required by the statement of work and how many employees were required to perform them. Lacalli was, at that point, delinquent in providing the information to his supervisors, so he created a spreadsheet that broke out the individual tasks, prioritized them, and estimated the additional headcount necessary (7-8 employees) with instructions that plaintiff should confer with her team to determine how many heads each task would really take. Getting to that point took two months. Plaintiff does not dispute Lacalli's version of these events.

By October 2010, problems had developed between Lacalli and plaintiff. Plaintiff had, in fact, already started looking for other jobs in the company. On October 15th, plaintiff complained to her human resources representative, Gloria Turner, that Lacalli did not know how to articulate what he wants, that he was interfering with her customer relationships, that he did not listen to her, and that there was confusion up and down the chain of command. On October 26th, plaintiff articulated a concern that Lacalli would blame her because he was not getting the

results he wanted.[2] Lacalli, meanwhile, was complaining to Kniest about plaintiff's work product and his general inability to count on her:

> The material that Lisa sent us is not worth looking at . . . This simple task took her one week. She still shows needing 35.5 heads based on budget shortfall which is exactly what I told her not to do.

> This is not the only problem I am having with her. Although she appears to be developing a good report [sic] with her team, I am not getting anything I ask for. I have been a senior manager for almost 15 years and I have never had a problem like this. I would like to talk with you about this when you are out here next week.

Dkt. # 26-1 at 14.

Kniest scheduled an all-hands meeting with her managers for October 14, 2010, at which each manager was to make a brief presentation regarding his or her team's performance and activities. Eight days before the meeting, Kniest asked for a written summary of the presentations by October 12th, sending reminders on October 8th and the morning they were due. Plaintiff was the only manager who failed to timely submit her report. She also failed to provide any explanation or apology, simply sending an email stating "Late Wednesday." Dkt. # 27-2 at 8. Plaintiff ultimately turned in the report on Thursday morning, just before the meeting started.

Plaintiff and Lacalli met on November 10th for about an hour. The conversation did not go well. Lacalli reported to Kniest that he and plaintiff "are clearly 180 degrees off in our impressions of EVERYTHING that has happened." Dkt. # 26-1 at 16. Plaintiff lodged another complaint with human resources regarding a wide array of subjects, including communication problems, objections to the way she is being treated, and chain of command issues. With regards

---

[2] On that same day, William Helms lodged a complaint alleging that Lacalli had belittled and demeaned him and plaintiff, had compromised plaintiff's authority with her subordinates and outsiders, and had excluded Helms from activities related to a program database he had set up and run for three years (the DMS project). Helms, too, expressed a concern that he might be retaliated against.

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT          -5-

to that morning's meeting, plaintiff noted:

> [Lacalli] gave me a bad PE, he says I don't support him. DMS tracking - the
> engineers dropped the ball because they don't communicate. Suneet reports to me
> so he runs data by me then Rob. The engineers don't respond to me, but I am
> approving Suneet's work. No one listens but when Suneet talks managers all listen.
> Some are more empowered than others. The platform contract is his (Rob's) job.
> He set up staff meeting on Monday over my meeting, one of the topics is IFS - my
> task.

Dkt. # 36-1 at 13. At about the same time, one of plaintiff's team members described the
situation as follows:

> Lisa is having problems, she tells and I have seen Rob not utilizing her. He
> bypasses her at times. There is a chain of command issue. I am given a task and I
> report back to Lisa. She has several groups and I have seen this happen with other
> groups, Rob works directly with the leads and Lisa is not told about it and she gets
> upset.

> This is the way the chain of command works, Rob is the program manager and
> acting chief engineer in Seattle. Lisa is the IFS manager. What's happening, Rob is
> doing Lisa's job and she gets caught not knowing what's happening. I don't think
> Rob has it in for Lisa, but he is micro-managing too deep into it. Instead of
> delegating, he is doing it himself. Questions from customer, Rob handles instead of
> giving to Lisa. There is a delegation issue. The manager feels less valued. . . .

> There is head-butting between Rob and Lisa.

Dkt. # 36-2 at 26.

In mid-November 2010, Kniest asked plaintiff to prepare a comparative analysis of two
different locations in order to determine which was the better choice for Executive Flight
Operations ("EFO") activities. Kniest expected the task to take about a week, but did not give
plaintiff a deadline. On November 24th, plaintiff announced that Seattle was the better of the
two options and promised to "pull together a white paper supporting my recommendation." Dkt.
# 27-1 at 2. Kniest sent a reminder email on December 5th requesting the analysis by December
10th. Plaintiff emailed a two-page summary of the existing EFO activities in Seattle to Kniest on

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT          -6-

December 11th.[3] Kniest promptly noted a number of inadequacies, particularly the almost complete absence of any discussion of the pros and cons of the other potential site, and requested revisions by the end of the following week "OR since EPU issues need to take priority, let me know by what date you can address." Dkt. # 27-1 at 5-6. Plaintiff did not respond. Ten days later, on December 21st, Kniest sent a reminder email. Plaintiff responded that she had been focused on the EPU issues and would get back to Kniest in a month. Kniest summarized the surprising length of time the task had already taken and insisted on a January 7th deadline. The product Kniest received on January 7th contained very little analysis: plaintiff simply listed the five questions Kniest had posed on December 11th and gave conclusory or abstract answers to four of them. Kniest requested additional analysis. What plaintiff produced on January 18th was so far from what Kniest wanted that she asked if plaintiff had sent the wrong file. Plaintiff responded, "What I produced to you was based on our conversation we had on Wednesday, 12 January." Dkt. # 27-1 at 18. Kniest was not impressed, stating "It is absolutely not based on that conversation. As I said, I don't think I'm going to get what I need/have asked for and I've spent too much time on this already. I will figure out another way or do the analysis myself." Id. Plaintiff does not dispute that she was unable to produce an acceptable site comparison as requested by her second level manager.

At the start of 2011, plaintiff had four significant projects outstanding. Lacalli reviewed plaintiff's "to do" list with her and gave specific instructions and deadlines. When plaintiff failed to timely deliver acceptable products on three of the four projects, Kniest urged Lacalli to take formal corrective action. On January 26, 2011, Turner and Lacalli issued a corrective action memorandum ("CAM") to plaintiff for "failing to perform tasks in a satisfactory manner and in accordance with management direction." Dkt. # 26-3 at 10. Plaintiff refused to sign the

---

[3] The document is five pages long, including a title page, a table of contents, and graphics. Dkt. # 27-1 at 7-11.

document, blaming Lacalli for failing to communicate expectations and accusing him of character assassination.

In a statement to human resources dated January 28, 2011, plaintiff asserts that she has been "falsely accused" of failing to take ownership of projects and/or missing deadlines, that she in fact pulled the headcount data "together in a week and followed the directions to the letter," that she is not at fault when other managers do not produce necessary data, and that "Rob can't do his job and is blaming it on me." Dkt. # 36-1 at 15. At the same time, Kniest reached out to human resources, noting that plaintiff's "behavior becomes increasingly bizarre and combative" following the issuance of the CAM. Dkt. # 27-3 at 14. "She is starting to send emails to Rob and cc others in which her tone makes it clear that she is angry with [management] and her team is starting to get concerned. We have addressed this with Lisa before but she continues. It is starting to have wide reaching impacts on a team who struggled with morale before her arrival." Id.

On January 31, 2011, plaintiff met with Karen Minalia, a human resources manager to discuss the CAM and her response options. Plaintiff stated that she had been warned that Lacalli treats women differently than he treats men and that she wanted Lacalli to "respect her diversity." Dkt. # 36-1 at 37. As an example, plaintiff noted that Lacalli had pulled her and a male manager into his office that morning to go over a list of action items on a white board with due dates that had been missed. Lacalli talked only about plaintiff's missed dates and did not mention the dates the other manager had missed. He also provided instructions regarding the outstanding tasks that varied from directions he had set forth in previous emails. Minalia stated that Boeing does not tolerate unequal treatment of women and that if plaintiff had contacted EEO, they would perform an objective investigation of the matter.[4] With regards to the

---

[4] Plaintiff told Minalia that she had contacted EEO the week before. There is no evidence of a mid-January EEO complaint, however. Minalia contacted EEO to let them know about the situation.

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT          -8-

communication problems plaintiff was having with Lacalli, Minalia "advised Lisa that the best way to approach a communication 'disconnect' with your management is to try to determine what part you have control over, and fix that. Try to take accountability for the part that you play in the relationship." Dkt. # 36-1 at 38. Plaintiff resented the implication that she was not taking responsibility and suggested that it was Lacalli who should receive a CAM for verbally changing instructions, then denying it when her product did not satisfy the original instructions.

As part of the CAM process, Lacalli outlined three specific tasks that plaintiff was to complete in the upcoming months, each with its own deadlines. The first deadlines were a week away, February 11th, when plaintiff was to provide execution plans and schedules for two of the tasks: Lacalli hoped that the final products could be delivered by the end of February, but wanted plaintiff's input before setting a final due date. He also instructed her to "use good judgment in communicating with team so as not to be counter productive/disruptive (i.e.: not forwarding emails that contain my critique of performance)." Dkt. # 26-1 at 19. The next day, plaintiff notified Lacalli (and five members of her team), that she would be unable to develop the execution plans and schedules by February 11th because key employees would be out of the office at conferences that week. Lacalli removed the team members from the email string, added Kniest, and insisted that a week was enough time to perform this preliminary task.

On February 7, 2011, plaintiff submitted a complaint to the EEO. The version in the record appears to contain both plaintiff's allegations and commentary from EEO staff. Dkt. # 36-1 at 45-49. Plaintiff complains about a number of interactions, many of which are directed at Lacalli's management style and decisions, but a few of which are based on comparisons between the way Lacalli treats her and the way he treats her male colleagues.

On February 8th, plaintiff again told Lacalli that his schedule for receiving the execution plans was not realistic. He was again unmoved, insisting that a delay in the planning stage would adversely affect the delivery dates. Kniest jumped into the conversation, suggesting options for

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT             -9-

communicating with employees while at a conference and pointedly noting, "Sometimes we don't have the luxury of doing things at a pace that is comfortable. We need and have needed you to respond to direction in a more positive 'I can/will figure out a way to get there' and that's all part of this corrective action activity." Dkt. # 26-2 at 3. Plaintiff responded that she had already set up a teleconference with her employees, that she always responds positively, and that her team was overburdened. Two team members were copied. Kniest reminded plaintiff that the corrective action was an issue between plaintiff and her managers: "Please DO NOT forward emails of this nature to the team." Dkt. # 26-2 at 2.

Starting on February 11, 2011, Boeing's EEO department began interviewing and taking statements from various peers and team members regarding plaintiff's allegations of sexual discrimination. The investigation lasted approximately six months, but only six of the statements were taken before plaintiff's employment was terminated on March 23, 2011. The general consensus of the interviewees, whether female or male, seems to be that Lacalli was tough to work for, imposing unrealistic deadlines on assignments, providing inconsistent instructions and direction, criticizing without being constructive, micro-managing activities, and blaming his subordinates when he failed to meet his supervisors' expectations. For the most part, however, these criticisms reflected plaintiff's statements regarding her interactions with Lacalli. With regards to plaintiff, it was generally acknowledged that there was tension in the relationship, with some team members indicating that Lacalli was setting plaintiff up to fail by giving her assignments that could not be done in the time provided. Others stated that Lacalli was disrespectful toward plaintiff, ignored her in meetings, and excluded her from activities with clients. Although no one ever heard Lacalli make inappropriate comments about women in the workplace, at least two other women stated that Lacalli was more likely to engage with and listen to men than women in the organization. One woman felt isolated, belittled, and under-valued when she worked for Lacalli.

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT                    -10-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

     Meanwhile, Lacalli continued to pursue progress on the tasks specified in plaintiff's corrective action plan, and plaintiff continued to copy team members on emails whenever she felt that Lacalli and/or Kniest were being unfair. When Lacalli attempted to schedule a meeting with the Air Force, she objected, announcing that "the IFS Team is unable to support that meeting" and copying various employees. Dkt. # 27-3 at 21. By mid-February, Kniest had decided that plaintiff was "completely insubordinate" and requested further corrective action. Id. A second CAM was issued on Friday, March 4, 2011, for continuing "to communicate to others in a way that has been deemed counterproductive and disruptive to the work environment." Dkt. # 28-1 at 2. Plaintiff was demoted from a Level L to a Level K manager, suspended for five days, and advised to follow management directions and perform her work in a satisfactory manner, limiting her communications to a "need to know" basis so as not to adversely impact the productivity or morale of the team. She was instructed not to discuss the results of the March 4th meeting with her employees: Lacalli intended to describe the change as a reorganization at an all-hands meeting on March 8th. Plaintiff accused Lacalli of simply trying to protect himself and would not agree to keep the corrective action, downgrade, or suspension confidential. Over the weekend, plaintiff contacted members of her team to let them know that she had been told to "go away for the week" and would no longer be their manager. Dkt. # 28-1 at 11. Human resources was informed that employees were "wondering about their situation and what will happen to them." Dkt. # 28-1 at 25. Although plaintiff stated that she did not recall contacting any of her employees during her suspension, a human resources investigator, Eileen Williams, concluded that she lied and had, in fact, contacted a number of employees between March 4th and March 8th, effectively informing them that she had been demoted, suspended, or both. Williams empaneled the Employee Corrective Action Review Board ("ECARB") to review plaintiff's conduct and give a recommendation for further action. Based on the two previous CAM's and her disregard of her managers's instructions, the ECARB recommended that plaintiff's

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT     -11-

employment be terminated effective March 23, 2011.[5] There is no indication that Williams or the other members of the ECARB were aware of plaintiff's sex discrimination claims or the on-going investigation.

## DISCUSSION

**A. Disparate Treatment**

The WLAD makes it unlawful for an employer to discharge a person from employment because of her gender. RCW 49.60.180(2). Plaintiff may raise an inference of discrimination under the WLAD "by either offering direct evidence of an employer's discriminatory intent, or by satisfying the McDonnell Douglas [Corp. v. Green, 411 U.S. 792, 802 (1973)], burden-shifting test . . . ." Alonso v. Qwest Commc'ns Co., LLC, 178 Wn. App. 734, 743-44 (2013). See also Kastanis v. Educational Employees Credit Union, 122 Wn.2d 483, 491 (1993) ("In addition to the McDonnell Douglas test, the federal courts have recognized that a prima facie case of discrimination can be established by showing direct evidence of discriminatory intent.").[6] Plaintiff has declined to proceed under the burden-shifting analysis in this case. Dkt. # 35 at 19. She must, therefore, provide direct evidence from which a jury could reasonably find that gender was a substantial or significant motivating factor in the decision to terminate her employment. Kastanis, 122 Wn.2d at 491.

Plaintiff's theory of the case is that Lacalli dislikes women in the workplace and that, despite having recently participated in her selection for promotion, he gave her impossible assignments so that she would fail and he would have an excuse to fire her. Plaintiff offers no

---

[5] On the same date, plaintiff received two additional CAMs related to events occurring in December 2010. Those CAMs were not considered by the ECARB and had no impact on plaintiff's termination.

[6] The Supreme Court of Washington adheres to the three step McDonnell Douglas analysis if a claim of disparate treatment is based on circumstantial evidence. Hegwine v. Longview Fibre Co., Inc., 162 Wn.2d 340, 353-54 (2007).

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT          -12-

direct evidence to support either of these contentions, however. Direct evidence is evidence which, if believed, proves that the employer acted with discriminatory animus without the need to draw inferences or make presumptions. <u>Kiser v. Clark College</u>, 143 Wn. App. 1044 (2008). With regards to Lacalli's state of mind, plaintiff has not provided any evidence that Lacalli (or any other manager involved in the discipline or termination decisions) made inappropriate comments regarding women in the workplace.[7] Instead, plaintiff offers evidence that (1) she had been warned that Lacalli disliked women, (2) one of her team members thought that Lacalli discounted plaintiff's ideas at meetings because plaintiff is a woman, and (3) another woman who reported to Lacalli felt her situation was hostile and that she was treated differently because of her sex and/or race. Subjective opinions, whether plaintiff's or another's, are not direct evidence of discriminatory animus being themselves based on inferences drawn from ambiguous events and interactions. With regards to plaintiff's assignments, she has not provided any evidence that they were, in fact, unreasonably difficult or otherwise objectionable. Where plaintiff failed, others were able to succeed. Nor does she attempt to explain why she was unable to satisfactorily perform tasks assigned by Kniest who, until oral argument, was not accused of discriminatory animus. Plaintiff may feel that the tasks were unfair, that her managers' expectations were too high, and/or that Lacalli's directions and management style inhibited her performance, but such workplace issues are not evidence (either direct or circumstantial) of discriminatory intent. Even if the tasks were difficult, the fact that plaintiff was unable to perform them in a timely and adequate manner is not direct evidence that Lacalli intended her to fail, much less that he intended her to fail because she is a woman.

Just as importantly, plaintiff's termination was the result of her failure to comply with

---

[7] Katrina Jones stated that Lacalli made inappropriate comments in the workplace, but when pressed for details, it turned out that she was referring to work-related criticisms which she felt were undeserved: Lacalli had said Jones was incompetent, unqualified, and had a bad reputation. Dkt. # 36-1 at 54.

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT            -13-

express and repeated instructions to treat management disputes as confidential and to not broadcast intra-management disagreements to her team. Kniest felt plaintiff's actions in this regard constituted insubordination, and the termination notice stated "[y]our action caused disruption that had a negative impact on productivity and morale as your manager had not yet had the opportunity to discuss the changes in your status with the work group." Dkt. # 28-1 at 27. Plaintiff offers no justification for her failure to comply with management's directions. Her only argument is that she does not believe she caused any actual disruption in the workplace. The record does not support plaintiff's subjective belief, and the Court declines to second-guess the employer's judgment in this matter. White v. State, 131 Wn.2d 1, 19-20 (1997) (noting that "courts are ill-equipped to act as super personnel agencies."). The ECARB found that her conduct warranted termination, and there is no hint that gender played any role in the decision.

Plaintiff has failed to provide direct evidence from which a jury could reasonably find that gender was a substantial or significant motivating factor in the decision to terminate her employment.

**B. Retaliation**

Plaintiff also asserts that her termination was retaliatory. The WLAD makes it an unfair practice "for any employer . . . to discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden in this chapter . . . ." RCW 49.60.210(1). To prove her claim of retaliation, plaintiff must show that (a) she was engaged in statutorily protected activity, (b) there was an adverse employment action, and (c) retaliation was a substantial factor motivating the adverse action. Kahn v. Salerno, 90 Wn. App. 110, 128-29 (1998). Once a prima facie case of retaliation is presented, the burden shifts to defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action. Renz v. Spokane Eye Clinic, P.S., 114 Wn. App. 611, 618 (2002). Plaintiff bears the ultimate burden of persuasion, however, and must raise an inference of retaliation to withstand a motion for

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT            -14-

summary judgment.

Plaintiff cannot make a prima facie showing of retaliation. The first CAM was issued prior to plaintiff's statutorily protected activities. Despite counsel's glib assertion that plaintiff complained of gender discrimination as early as October 2010, the record shows that the first such complaint occurred in the weeks following her receipt of the January 26, 2011, CAM. The first CAM could not, therefore, be retaliatory. With regards to the second and third CAMs, plaintiff does not dispute that she repeatedly ignored management instructions to refrain from broadcasting intra-management disputes to her team. Even if the timing and circumstances of the CAMs were more favorable to plaintiff, there is no indication that any of the members of the ECARB were aware of plaintiff's complaint or the on-going investigation at the time of her termination. Thus, plaintiff has failed to offer any evidence from which a reasonable jury could infer that her protected activity was a substantial factor motivating the decision to terminate her employment.

For all of the foregoing reasons, defendant's motion for summary judgment is GRANTED. The Clerk of Court is directed to enter judgment against plaintiff and in favor of defendant.

Dated this 30th day of October, 2015.

*Robert S. Lasnik*
Robert S. Lasnik
United States District Judge

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT          -15-